[No. A076289. First Dist., Div. Three. Sept. 20, 1999.]

IRA EISENBERG, Plaintiff and Appellant, v.
ALAMEDA NEWSPAPERS, INC., et al., Defendants and Respondents.

## COUNSEL

Charles O. Morgan, Jr., and Andrew M. Rosner for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, John E. Carne, Kathy M. Banke and Steven J. Boranian for Defendants and Respondents.

## OPINION

**McGUINESS, P. J.**—Ira Eisenberg was hired by respondent Alameda Newspapers, Inc., (the Newspaper) as an investigative reporter, to write exposé-style articles for the Tri-Valley Herald (the Herald), a local Alameda County newspaper that served the Pleasanton-Livermore Valley area. In May 1994, the Herald published two articles written by Eisenberg, containing allegations of "corruption," "favoritism and influence-peddling" involving Ted Fairfield, an individual hired by local developers to obtain approval from the Pleasanton city government for a controversial luxury housing development. After Fairfield made a demand for a correction in accordance with Civil Code section 48a,[1] the Newspaper published a prominent retraction in the Herald, apologizing for its previous publication of "inaccurate and misleading information" concerning Fairfield, and stating that "[t]here is no evidence" he "was involved in improper, corrupt or illegal activities" relating to the development. Shortly thereafter, the Newspaper terminated Eisenberg's employment.

---

[1]Unless otherwise indicated, all further statutory references are to the Civil Code.

Eisenberg filed suit against the Newspaper, its managing editor (respondent Tim Graham) and editor (respondent Tim Hunt), alleging defamation, false light, wrongful termination, breach of employment contract, breach of the covenant of good faith and fair dealing, and fraud. This appeal arises from the trial court's grant of respondents' motion for summary judgment on all the causes of action of Eisenberg's complaint. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In order to understand the issues in this case, it is necessary to review the background of the dispute, which concerns Golden Eagle Estates, a 260-acre, 80-lot luxury home development located on Pleasanton Ridge in the City of Pleasanton (the City). From the preliminary stages of planning the development project (the Project) in 1984 through its approval by the City in 1988, the exact physical proximity of the development site (the Site) to the Calaveras fault was a topic of considerable controversy.

Developers Bill Currin and Mike Timm hired civil engineer Ted Fairfield to evaluate the Site and guide them through the planning process. The initial report of geologist Marc Seeley to the City in 1984 could find no evidence of the Calaveras fault, but recommended further study and "deep borings" to determine the overall stability of the Site. City Planning Director Brian Swift signed a planning staff report recommending against approval of the Project. Over the complaints of Fairfield and the developers, Swift required the preparation of an environmental impact report on the proposed development, focusing on visual, aesthetic and traffic issues.

Meanwhile, the developers retained a second geologist, Murray Levish. Levish examined the Site, found no evidence of the Calaveras fault, and concluded that it was not there. Levish's conclusions generated considerable controversy. Roy Shelmon, a soils dating expert who consulted with Levish on the Site, termed Levish's conclusions "startling." Consequently, the City hired a third geologist, Dave Carpenter, to review Levish's work. Carpenter's evaluation was sharply critical of Levish's conclusions. The City ordered further seismic study. It retained Earl Hart, a geologist from the California State Division of Mines and Geology who had previously studied the Calaveras fault, as a consultant.

A fifth geologist, Dave Rogers, was hired by the City to review a soils report performed for the developers by Levish's company. In his report, Rogers severely criticized the Levish study as contrary to all previous geological studies of the Pleasanton Ridge, and suggested that Levish was biased in favor of the developers who had hired him. Rogers stated that

further soils work should not proceed until all the seismic and geological questions were resolved. He recommended that the City obtain an in-depth study to determine whether the Calaveras fault actually ran through the Site. At the time of making this recommendation, Rogers was not licensed to perform a state-mandated earthquake fault study. The City notified Rogers that his services were no longer required.

In early October 1988, Swift and Fairfield met with geologists Levish, Carpenter and Hart to discuss the seismic site studies. As a result of this meeting, additional trenches were dug at the Site, which all three geologists examined. The results were inconclusive, and did not reveal whether or not the Calaveras fault crossed the Site. Around the same time, geologist Seeley wrote the City a letter disavowing Levish's conclusions. Seeley continued to believe the deep borings he had originally recommended in his initial report should be performed. Carpenter disagreed, opining on the basis of similar studies in the Livermore area that such deep borings would be inconclusive. Seeley also disputed the conclusion of soils expert Shelmon that the Site was seismically stable.

In May 1989, the city planning department recommended that the City approve the Project, but conditioned its approval on the retention of yet another geologist to study the Site as grading, excavation and utility trenching took place. The City ultimately approved the Project, with the recommended conditions in force. Building code requirements applicable to the Project were upgraded to require single-family homes in the development to have foundation piers extending twelve feet into the ground, rather than the five to six feet found in older homes elsewhere in Pleasanton. A sixth geologist was retained by the City to monitor the development as it proceeded. Still, no trace of the Calaveras fault was found on the Site.

Nearly six years after the Project was approved and completed, the issue of its seismic safety was reopened when charges of incompetence and professional negligence were brought by the California State Licensing Board against the developers' geologist, Levish, prompting him to surrender his license. Planning Director Swift was asked to review the City's files on the development amid concerns that the Project had been approved too hastily and without sufficient study.

At this point, Eisenberg entered the controversy. He interviewed Rogers, who had been the geologist most critical of the geotechnical and seismic studies of the Project Site. Rogers criticized the City's subdivision approval process, which he considered insufficiently "open." However, Rogers did not believe the City, the developer, or Fairfield had done anything illegal in

obtaining approval for the Project, and he expressly told Eisenberg that. Rogers also resisted Eisenberg's repeated attempts to get him to endorse a reopened investigation of the Project. Instead, he told Eisenberg that he had "looked at it from every angle" and concluded that "they did everything to the letter of the law," even though "[w]e may not like it" and "may think it was sleazy . . . .'" Rogers referred Eisenberg to an attorney familiar with planning and subdivision law, and recommended that Eisenberg review an article Rogers had written entitled "Science versus Advocacy." Eisenberg did not read Rogers' article, contact the attorney, review the City's planning files, or research the city council meeting minutes on the Project.

On April 20, 1994, an article by Eisenberg was published in the Independent, a local Pleasanton-Livermore Valley newspaper. In the article, Eisenberg *quoted* Rogers as saying " 'Brian Swift was greasing the skids for Ted Fairfield,' " and reported that Rogers had accused Fairfield of having "used his considerable clout to blackball his firm, Rogers/Pacific, from doing any further consulting" for the City. In fact, Rogers had not actually originated the phrase "greasing the skids"; rather, it was Eisenberg himself who suggested that expression in his telephone interview of Rogers.[2] Neither had Rogers made the accusation that Fairfield had "blackballed" him from doing further work for the City; in fact, Rogers *had actually performed* further consulting for the City in 1993. Having failed to review the City's files on the Project or the minutes of meetings of the city council, Eisenberg did not know or report that Swift had originally recommended *against* approving the Project, and was instrumental in obtaining the additional seismic studies that showed no evidence of the Calaveras fault running through the Site.

In the spring of 1994, Eisenberg contacted Tim Hunt, the new editor of the Herald, seeking employment at that newspaper. In discussions, Hunt and Eisenberg discussed salary and benefits, including retirement. They agreed that Eisenberg would be hired as a "senior writer," leaving open the possibility that he might later be redesignated a "columnist" upon the approval of the editor-in-chief. However, respondents did not make any other promises regarding the duration of Eisenberg's employment, and specifically did not suggest that he could only be terminated for good cause or would be hired as

---

[2]The Oxford English Dictionary defines the verb "to grease" as, among other things, "[t]o lubricate with grease," and, by extension, "[t]o make to run easily." When used figuratively, the verb "to grease" includes such definitions as "to make things run smoothly" or "pay the expenses," as in the phrase *to grease the wheels*; "[t]o ply with money, to bribe . . . , to enrich"; or "to give to those who do not lack." (6 Oxford English Dict. (2d ed. 1989) p. 794, italics in original.) The precise phrase "grease the skids" does not appear to be in the Oxford English Dictionary. However, it is not unreasonable to interpret the phrase, as it was used in this context, as at the very least suggesting favoritism and influence-peddling, and possibly even graft, corruption and illegality.

anything other than an at-will employee. The Newspaper's standard practice, as reflected in its written personnel policies and employee handbook, had been to hire employees on a 90-day probationary basis, and treat employees hired for an unspecified term as terminable at will.

Eisenberg started work at the Herald on May 1, 1994. On May 3, he filled out and signed a form explicitly stating that his employment was "of an 'at will' nature." Eisenberg has acknowledged that no one ever told him anything that differed from this statement, and that it was consistent with his own understanding of the nature of his employment at the Herald.[3] Subsequently, on May 25, 1994, Eisenberg signed a form acknowledging both his receipt of the Newspaper's employee handbook, and his understanding that the contents of the handbook represented "the polices and procedures" of the Newspaper. Among other things, the employee handbook stated that all new employees were automatically placed on a "90-DAY INTRODUCTORY PERIOD" of probation, during which the employer could terminate their employment if they failed to meet the expectations of the job. Under a heading entitled "CAUSES FOR DISCHARGE," the handbook also restated the fact that, under the California Labor Code, "employment having no specified term is 'at will.' That means employment may be terminated by either the employer or the employee at any time, without cause, unless an agreement says otherwise."[4]

---

[3]Among other things, the "Applicant's Statement" signed by Eisenberg on May 3, 1994, stated: "I hereby understand and acknowledge that, unless otherwise defined by applicable law, any employment relationship with this organization is of an 'at will' nature, which means that the Employee may resign at any time and the Employer may discharge [the] Employee at any time with or without cause. It is further understood that this 'at will' employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization."

[4]The Newspaper's employee handbook provided under the section entitled "90-DAY INTRO-DUCTORY PERIOD" as follows: "All new full-time employees are placed on a three month introductory period which is regarded as a time for the employer to review the employee's work performance to decide the employee's ability to perform the requirements of the assigned job. It is also a time for the new employee to evaluate the tasks required of the new job, and the new company to determine if this is the job desired. [¶] If, during the first three months, the employer [or] the employee decides the employee or the employer fails to meet the expectations of the job, they can terminate the employment."

The following section, entitled "CAUSES OF DISCHARGE," provides as follows: "It is well for everyone to understand that there are certain types of conduct that can lead to discharge. The employer, however, will take no action without the [sic] sufficient evidence. And, the employer will give the employee an opportunity to state his/her case even when evidence is persuasive. [¶] The California Labor Code provides that employment having no specified term is 'at will.' That means employment may be terminated by either the employer or the employee at any time, without cause, unless an agreement says otherwise. [¶] In contrast, if the employee is hired for a specified period of time, the employer can fire the employee if the employee has willfully breached, habitually neglected, or demonstrated a continuing incapac-

Within a week of starting his job as a new "senior writer" at the Herald, Eisenberg contacted the Alameda County District Attorney's office and "asked to speak to the assistant DA in charge of the grand jury." He was referred to Assistant District Attorney Stacy Walthall. Eisenberg provided Walthall with copies of both his earlier Independent article and a letter from Rogers to Rebecca Dennis, a member of the city council. At the time, the district attorney was not investigating the Project. Eisenberg had still not reviewed the City's records.

Thereafter, Eisenberg wrote an article on the Golden Eagle development controversy, entitled "GRAND JURY CONSIDERS PLANNING DEPARTMENT PROBE." The Herald published this headline conspicuously in a "banner" position at the top of the front page of its Sunday, May 8, 1994, edition. In the article, Eisenberg wrote that "[t]he stink of corruption that lately issued" from Golden Eagle Estates "still hangs heavy over Pleasanton City Hall"; "accusations of favoritism and influence-peddling" had been "lodged against the [C]ity by a consultant [(Rogers)] who says he was hired to review the Golden Eagle project, then fired for telling the truth about it"; these charges "will be forwarded to the [grand] jury next week"; and a "decision about whether to launch a full-scale investigation should be forthcoming shortly thereafter." Eisenberg quoted the assistant district attorney as saying " 'This is something the grand jury will be glad to take a look at.' "[5] Eisenberg also reported that Planning Director Swift stood accused of having "greased the skids" for "politically influential developer's representative," Fairfield; and that Fairfield himself, not the developers, had "hired" the controversial geologist Levish. In a smaller adjoining article based on the allegations made in Eisenberg's article, an uncredited Herald staff writer reported that "[a] former geologist [Rogers] working for the [C]ity, who said in 1988 that the area was unsafe, has now gone to the district attorney alleging he was fired for questioning the plan," and "also claims the Planning Commission, specifically City Planning Director Brian Swift, instead hired another con-sultant to say the land was safe so that the project would be approved without difficulty."

---

ity to perform, his or her duties." On May 25, 1994, Eisenberg acknowledged in writing receiving this employee handbook, and that its "contents are the polices and procedures" of the Newspaper.

[5]Eisenberg's May 8, 1994, article began as follows: "The stink of corruption that lately issued from posh Golden Eagle Estates up on Pleasanton Ridge still hangs heavy over Pleasanton City Hall, and now it's wrinkling the nose of the Alameda County District Attorney. [¶] 'This is something the grand jury will be glad to take a look at,' said assistant DA Stacy Walthall, the jury's liaison and legal adviser. [¶] The accusations of favoritism and influence-peddling lodged against the city by a consultant who says he was hired to review the Golden Eagle project, then fired for telling the truth about it, will be forwarded to the jury next week. A decision about whether the launch a full-scale investigation should be forth-coming shortly thereafter."

These statements were inaccurate and misleading. It was simply false to suggest that Rogers had "lodged" criminal charges against the City with the district attorney, when it was Eisenberg himself who was the sole source of the district attorney's purported interest in the Golden Eagle controversy. In fact, as Eisenberg has admitted, neither Rogers *nor anyone else* (aside from Eisenberg himself) ever made *any* accusations of favoritism, influence-peddling, or illegality against Swift, the planning department, or the City government. Eisenberg failed to report that Seeley (the first geologist to study the Site) told him that Rogers "[m]ay have [an] axe to grind," and considered Fairfield a "professional" who "never leaned on him to bend the truth" or reach a particular conclusion. It was also inaccurate to report that the Alameda County District Attorney was forwarding Rogers's alleged "accusations" to the grand jury, or that "a full-scale investigation" was actively being considered. Finally, as Eisenberg knew, it was developer Currin, not Fairfield, who had hired Levish.

A week later, Eisenberg published a second article, entitled "PLANNING REPORT BACKS STAFF'S OK OF GOLDEN EAGLE." This time Eisenberg reported that Swift's "long-awaited" report on the Golden Eagle controversy did "not address" the failure to perform "deep earth boring . . . to try and identify the precise location of geological hazards before final approval was granted" of the Project, and did not "answer charges by geologist Dave Rogers that [Swift] or his staff 'greased the skids' for Golden Eagle and its influential 'representative,' Ted Fairfield." Thus, Eisenberg continued to represent that Rogers had accused Planning Director Swift and developers' representative Fairfield of collusion and corruption, when in fact Rogers had not made such accusations. The same day, editor Hunt himself published an article defending "our senior reporter Ira Eisenberg," in which Hunt represented that Eisenberg had simply "reported the allegations of geologist Dave Rogers."

On May 24, 1994, Fairfield's attorneys sent the Herald a letter demanding publication of a "correction of inaccurate and misleading information" contained in Eisenberg's article published on May 8, 1994. The letter specified eight items as to which demand was made that the Herald "publish a correction within three (3) weeks of receipt of this letter . . . in substantially as conspicuous a manner as the article by Ira Eisenberg containing the inaccuracies."[6] Although the letter twice stated that it was not written "out of a desire to litigate this matter," it repeatedly stressed the importance both of

---

[6]The eight items specified in the demand letter were: (1) the statement in the first sentence referring to " '[t]he stink of corruption . . . ,' " because it "implies that Ted Fairfield was involved in improper, corrupt and possibly illegal activities concerning Golden Eagle"; (2) the heading " 'Grand jury considers Planning Department probe' " and the alleged quote from the

"presenting correct and accurate information" to the public, and of Fairfield's "[r]eputational interests" and "desire to restore his good name." In view of the content and tone of the letter, as well as its express demand for a published correction of eight specific alleged inaccuracies "within three (3) weeks . . . in substantially as conspicuous a manner" as the original Eisenberg article, it was clear to Hunt that the demand for correction was written pursuant to section 48a as a condition precedent to recovering general and exemplary damages in a projected defamation action against the Herald.[7]

In keeping with his established practice in responding to a demand for a correction, Hunt conducted his own investigation of Fairfield's claims and met separately with Fairfield and Eisenberg. Hunt learned that Rogers, Eisenberg's primary source, had accused Eisenberg of misquoting him, and had apologized to Fairfield for the statements attributed to Rogers; and that Eisenberg had published the accusations against Fairfield and the City without ever reviewing the City's planning files on the Project or any city council meeting minutes. In the course of reviewing the City's public

---

assistant district attorney that " ' "This is something the grand jury will be glad to take a look at . . . ," ' " because they were misleading in not informing the public that it was Eisenberg himself who gave the information to the grand jury; (3) the statement that " 'Fairfield himself has declined to respond to repeated requests for an interview,' " because Fairfield had actually contacted editor Hunt prior to publication and offered to make himself available for an interview; (4) the statement that "complaints" had been made that City Planning Director Swift " ' . . . greased the skids for Ted Fairfield . . . ,' " because "the obvious inference was to imply improper, unethical and possibly illegal activities on the part of Ted Fairfield"; (5) the reference to " ' . . . accusations of favoritism and influence-peddling lodged against the [C]ity . . . ,' " for the same reason; (6) the statement that developers Currin and Timm hired Fairfield "to 'convince the City it was safe to build homes on the [S]ite,' " and that Fairfield " 'in turn hired geologist Murray Levish,' " because the statements were both factually inaccurate and insinuated that Fairfield was hired for "improper and unethical" purposes; (7) the statement that Rogers had " 'contended that Fairfield used his influence with Pleasanton's elected officials to banish Rogers' firm . . . from doing business' " with the City because its "obvious inference and intention is to imply improper, unethical and possibly illegal activities on the part of Ted Fairfield"; and (8) the alleged quotation that " ' "we all know how shady the development business can get . . . ," ' " for similar reasons.

[7]Civil Code section 48a provides in pertinent part as follows:

"1. In any action for damages for the publication of a libel in a newspaper, . . . plaintiff shall recover no more than special damages unless a correction be demanded and be not published . . . . Plaintiff shall serve upon the publisher, at the place of publication . . . , a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication . . . of the statements claimed to be libelous.

"2 If a correction be demanded within said period and be not published . . . in substantially as conspicuous a manner in said newspaper . . . as were the statements claimed to be libelous, in a regular issue thereof published . . . within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages; provided that no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication . . . with actual malice . . . ."

records himself, Hunt discovered that City Planning Director Swift had actually recommended against approval of the Project; the City's independent geologist, Carpenter, had criticized Levish's analysis and persuaded the City to undertake extensive further seismic studies; the City had procured Calaveras fault expert Hart of the state Division of Mines and Geology to review the seismic evaluation of the Site; and the City had thereafter required the developers to perform additional testing not required by state law but recommended by Hart and Carpenter. Hunt also learned that although Fairfield had recommended two geologists to developer Currin, one of whom was Levish, it was Currin, and not Fairfield, who had hired Levish.

Concerned with the quality and thoroughness of Eisenberg's investigation and the accuracy of his published articles, on May 27, 1994, Hunt and Graham asked Eisenberg if he had any evidence to support the allegations made in his articles about "the stink of corruption . . . ," "favoritism and influence peddling," "complaints that [Swift] greased the skids for Ted Fairfield," or that Fairfield was hired in order "to convince the [C]ity it was safe to build homes" on the Site and had himself in turn hired Levish to fulfill that purpose. Eisenberg defended his articles as "good journalism," but did not provide any specific evidence to support his allegations. Graham and Hunt terminated Eisenberg's employment with the Herald later the same day, less than one month after he had been hired.

Under section 48a, a potential media defendant can avoid exposure to claims for general or exemplary damages by publishing a retraction in the manner specified by the statute. On June 7, 1994, therefore, the Herald published a retraction in compliance with section 48a. This "Correction and clarification" stated that (1) the May 8 and May 15 articles "contained inaccurate and misleading information" about the Golden Eagle development, Fairfield and the Alameda County Grand Jury; (2) "[t]here is no evidence that Fairfield was involved in improper, corrupt or illegal activities" in connection with the Project; (3) the editors of the Herald "regret any insinuation" that Fairfield or anyone connected with the Project was "engaged in any acts of collusion, illegal or otherwise"; (4) the May 8 article "should have made it clear that it was the reporter himself" who contacted the Alameda County District Attorney and presented information concerning the Project; (5) the developers themselves, not Fairfield, had hired geologist Levish; and (6) "[a]ny insinuation" Fairfield "engaged in improper and unethical behavior" concerning the Project "is incorrect, and we regret the errors in this regard." The retraction did not mention Eisenberg by name.

On June 19, 1994, after publishing the retraction, Hunt took the additional step of publishing his own article on the history of the Golden Eagle

controversy, entitled "City prudent with Golden Eagle." Among other things, the article made the following points: (1) "[r]eporting in this newspaper, which was inaccurate and unfair and lacked balance, helped spur the controversy"; (2) "[c]ontrary to claims, the [C]ity acted reasonably and prudently"; (3) "Planning Director Brian Swift made Golden Eagle Estates developers clear many more hurdles than was normal at the time"; (4) "[t]he Planning Department twice recommended against plans for Golden Eagle"; (5) "[i]n earlier reporting, Swift was treated particularly unfairly with a number of inaccurate statements printed about his performance"; (6) "[i]n fact, [Swift] did his job professionally and went the extra steps to ensure that the [P]roject received the studies necessary so the department could recommend a decision"; (7) "[t]he dispute over the location of the Calaveras fault and whether it crosses the [Project] property is one that probably cannot be resolved" but instead is "the type of debate between professionals that reasonable people can disagree on"; and (8) "[t]here was no effort to hide the possible presence of the fault" on the Site. Once again, Hunt's article made no reference to Eisenberg by name.

Eisenberg subsequently submitted his own demand to the Herald for a retraction, claiming that the Herald's earlier retraction of the statements in Eisenberg's two articles and the Hunt article had defamed Eisenberg. Through its attorney, the Herald refused Eisenberg's demand on the grounds its own earlier retraction had been required by the lack of any evidence for "the very serious and inflammatory charges made by Mr. Eisenberg about Ted Fairfield, Brian Swift and the City of Pleasanton," as well as by Eisenberg's "breach" of journalistic standards in failing to disclose the fact it was he himself who had approached the Alameda County District Attorney with the charges about which he was writing. The letter invited Eisenberg to submit any additional evidence in support of his charges of corruption "as soon as possible."

Thereafter, Eisenberg filed this lawsuit against respondents, alleging causes of action for defamation, false light, wrongful termination in violation of public policy, breach of implied-in-fact contract, breach of the implied covenant of good faith and fair dealing, and fraud. At the conclusion of discovery, respondents moved for summary judgment. The trial court granted the motion and entered judgment for respondents. This appeal followed.

## STANDARD OF REVIEW

Code of Civil Procedure section 437c, subdivision (c), *requires* a trial court to grant summary judgment if all the papers and affidavits submitted,

together with "all inferences reasonably deducible from the evidence" and uncontradicted by other inferences or evidence, show that "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 217, p. 629.) ■ Where the defendant is the moving party, he or she may meet the burden of showing that a cause of action has no merit by proving either that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action. Once that burden is met, the burden *shifts* to the plaintiff to show the existence of a triable issue of one or more material facts with respect to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (o)(2); *Sangster* v. *Paetkau* (1998) 68 Cal.App.4th 151, 161-163 [80 Cal.Rptr.2d 66] (*Sangster*).)

A defendant moving for summary judgment may establish that an essential element of the plaintiff's cause of action is absent by reliance on the pleadings, competent declarations, binding judicial admissions contained in the allegations of the plaintiff's complaint, responses or failures to respond to discovery, and the testimony of witnesses at noticed depositions. (Code Civ. Proc., § 437c, subd. (b); *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 20-21 [112 Cal.Rptr. 786, 520 P.2d 10]; *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579-593 [37 Cal.Rptr.2d 653] (*Union Bank*); *Uram* v. *Abex Corp.* (1990) 217 Cal.App.3d 1425, 1433 [266 Cal.Rptr. 695]; *Brown* v. *City of Fremont* (1977) 75 Cal.App.3d 141, 145-146 [142 Cal.Rptr. 46]; *Saporta* v. *Barbagelata* (1963) 220 Cal.App.2d 463, 468-469 [33 Cal.Rptr. 661] (*Saporta*).) The plaintiff may not rely on his or her pleadings alone, but must file opposition to the motion, with affidavits setting forth *specific facts* demonstrating that a triable issue of material fact exists as to the cause of action or defense. (Code Civ. Proc., § 437c, subd. (o); *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 743-746 [41 Cal.Rptr.2d 719] (*Villa*); *Union Bank, supra,* 31 Cal.App.4th at pp. 590-593; *Saporta, supra,* 220 Cal.App.2d at pp. 468-469; 6 Witkin, Cal. Procedure, *supra,* Proceedings Without Trial, § 201, pp. 613-614.)

The purpose of the summary judgment procedure is to identify those cases in which "there is no triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) For practical purposes, an issue of *material* fact is one which, in the context and circumstances of the case, "warrants the time and cost of factfinding by trial." (*Martin* v. *Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 [35 Cal.Rptr.2d 181] (*Martin*).) In other words, not every issue of fact is worth submission to a jury. The purpose of summary judgment is to separate those cases in which there are *material* issues of fact meriting a trial from those in which there are no such issues.

Thus, where the parties have had sufficient opportunity adequately to develop their factual cases through discovery and the defendant has made a sufficient showing that the plaintiff's action has no merit, in order to avert summary judgment the plaintiff must produce *substantial* responsive evidence sufficient to establish the existence of a triable issue of material fact on the issues raised by the plaintiff's causes of action. (*Sangster, supra,* 68 Cal.App.4th at pp. 162-163; *Martin, supra,* 29 Cal.App.4th at pp. 1730-1735.)

■ On appeal, we review the trial court's decision to grant or deny the summary judgment motion de novo, on the basis of an examination of the evidence before the trial court and our independent determination of its effect as a matter of law. (*Sangster, supra,* 68 Cal.App.4th at p. 163; *Villa, supra,* 35 Cal.App.4th at p. 741; *Union Bank, supra,* 31 Cal.App.4th at p. 579; *Jambazian* v. *Borden* (1994) 25 Cal.App.4th 836, 843-844 [30 Cal.Rptr.2d 768]; 6 Witkin, Cal. Procedure, *supra,* Proceedings Without Trial, § 217, p. 629.) We also independently review the trial court's determination of questions of law. To that end, we are not bound by the trial court's stated reasons or rationale. In short, we review the summary judgment without deference to the trial court's determination. (*Sangster, supra,* 68 Cal.App.4th at p. 163; *Transamerica Ins. Co.* v. *Superior Court* (1994) 29 Cal.App.4th 1705, 1713-1714 [35 Cal.Rptr.2d 259].)

## DEFAMATION

■ The trial court granted summary judgment in respondents' favor on Eisenberg's defamation and false light causes of action on the grounds that (1) respondents' published retraction was made in response to a statutory demand under section 48a and was absolutely privileged under section 47, subdivision (b);[8] and (2) the statements in Hunt's June 19, 1994, article were not actionable as a matter of law because they were either "substantially true" or were statements of opinion. Eisenberg contends these determinations of the trial court were erroneous. We agree with Eisenberg that the trial court erred in ruling that the retraction was privileged under section 47(b). However, we conclude the grant of summary judgment was nevertheless correct. As a matter of law, none of the statements at issue was defamatory.

## THE LITIGATION PRIVILEGE

In granting summary judgment on appellant's causes of action for defamation and false light, the trial court first found that the Herald's published June 7, 1994, retraction, entitled "Correction and clarification," "was a

---

[8]For convenience, we will refer to section 47, subdivision (b), as section 47(b).

statement made in an official proceeding authorized by law, *i.e.* Civil Code Section 48a[,] and is therefore absolutely privileged under Civil Code Section 47(b)."[9] The trial court's finding is incorrect on its face in stating that the retraction was "a statement made in an official proceeding authorized by law." ▮▮▮ This category of the privilege, as codified in section 47(b)(3), applies only to statements made in the context of "official," i.e. governmental, proceedings: that is, proceedings involving the government, an agency or official thereof, or quasi-judicial proceedings otherwise reviewable by writ of mandate. (*Slaughter* v. *Friedman* (1982) 32 Cal.3d 149, 156 [185 Cal.Rptr. 244, 649 P.2d 886]; *Hackethal* v. *Weissbein* (1979) 24 Cal.3d 55, 59-61 [154 Cal.Rptr. 423, 592 P.2d 1175, 9 A.L.R.4th 791]; *Cuenca* v. *Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 993-994 [225 Cal.Rptr. 852].) ▮▮▮ The fact that the retraction in this case was published in response to a section 48a demand letter does not make it part of an "official" proceeding. Indisputably, no government agency, officer, body or proceeding was involved even peripherally in the publication of the retraction.

Nevertheless, as the parties have framed the issue, the question remains whether the retraction was absolutely privileged under the judicial privilege of section 47(b)(2). Respondents vigorously defend the trial court's decision on this ground. Because of the expansion by the courts of the judicial privilege to various communications made *in anticipation of litigation*, we must address the question whether the trial court was correct in applying this form of the privilege in this case.

▮▮▮ The "usual formulation" of the privilege set out in section 47(b) is that it "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]" (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*); *Edwards* v. *Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29 [61 Cal.Rptr.2d 518] (*Edwards*).) These requirements for invoking the privilege are based upon section 47(b)'s purpose of affording litigants and witnesses "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Silberg, supra,* 50 Cal.3d at p. 213.) "In other words, the litigation privilege is intended to encourage parties to feel free to

---

[9]In pertinent part, section 47 states: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure . . . ."

exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation. [Citation.]" (*Edwards, supra,* 53 Cal.App.4th at p. 29.)

 Although the express language of section 47(b) applies only to communications made *in* a judicial or other official proceeding, courts have applied the privilege to some communications made *in advance* of anticipated litigation. (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1193-1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Edwards, supra,* 53 Cal.App.4th at pp. 30-37; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 577-578 [131 Cal.Rptr. 592].) This expansion of the judicial privilege to statements made in a prelitigation context is explicitly reflected in the Restatement Second of Torts, under which attorneys, parties and witnesses are *absolutely privileged* "to publish defamatory matter concerning another in communications *preliminary* to a *proposed* judicial proceeding." (Rest.2d Torts, §§ 586-588, italics added; see also *Edwards, supra,* 53 Cal.App.4th at pp. 31-32.) Nonetheless, as the Restatement's comments make clear, this prelitigation privilege "applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." (Rest.2d Torts, § 586, com. e, p. 248; *id.,* § 587, com. e, p. 250; see also *Edwards, supra,* 53 Cal.App.4th at p. 32; *Laffer* v. *Levinson, Miller, Jacobs & Phillips* (1995) 34 Cal.App.4th 117, 122-125 [40 Cal.Rptr.2d 233].)

As this court has previously stated, "[t]he fact that California courts have extended the judicial privilege to prelitigation communications by way of the Restatement [Second of Torts] does not change the underlying rationale and justification for the privilege, which remains the same whether the communications at issue are made in the course of an actual judicial proceeding or in a prelitigation context. . . . [T]he privilege is based on a policy of encouraging *free access to the courts* for assistance in the resolution of disputes and the ascertainment of truth, without fear of incurring a derivative tort action." (*Edwards, supra,* 53 Cal.App.4th at p. 33, italics in original.) Because "[t]his rationale for the privilege cannot logically be extended to communications made *prior* to or *in anticipation* of litigation until the prospect of litigation has gone from being a mere possibility to becoming a contemplated *reality*," (*ibid.*) we have therefore held that the litigation privilege. only attaches when imminent access to the courts is seriously proposed and actually contemplated, seriously and in good faith, as a means

of resolving a dispute and not simply a tactical ploy to induce a settlement. (*Id.* at pp. 34-39, italics in original.)

██ Defending the applicability of the privilege in this case, respondents argue that the very purpose of a section 48a demand letter is to enable the party making the demand to obtain general and exemplary damages in subsequent defamation litigation, which itself is proposed for the purpose of resolving an underlying dispute as to the truth or accuracy of allegedly defamatory statements. Respondents urge that because the retraction or correction published in response to such a demand is *the* statutory means by which a potential media defendant can avoid exposure to claims for general or punitive damages, both the demand for a correction and the published retraction itself are inextricably linked to threatened litigation. Arguably, a retraction is by its very nature a "communication" that "has some relation to" and is "preliminary to a proposed judicial proceeding . . . that is contemplated in good faith and under serious consideration." (Rest.2d Torts, § 586, & com. e, pp. 247-248; *id.,* § 587 & com. e, pp. 248, 250; see *Edwards, supra,* 53 Cal.App.4th at pp. 31-37.) Thus, respondents argue, the contents of *any* retraction, clarification or correction published in response to a section 48a demand must be subject to the protection of the litigation privilege.

We disagree. No published decision has ever held a newspaper retraction is privileged under section 47(b). It was respondents' burden to establish the preliminary facts on which to base their affirmative defense of privilege. (*Edwards, supra,* 53 Cal.App.4th at p. 37; *Fuhrman* v. *California Satellite Systems* (1986) 179 Cal.App.3d 408, 421-423 [231 Cal.Rptr. 113], disapproved on other grounds in *Silberg, supra,* 50 Cal.3d at pp. 212, 219.) In moving for summary judgment, they were therefore required to establish that at the time the retraction was published on June 7, 1994, ". . . litigation was not a mere possibility on the horizon, but was actually proposed, seriously and in good faith, as a means of resolving the dispute." (*Edwards, supra,* 53 Cal.App.4th at p. 37.)

On this record, we conclude respondents failed to make this necessary showing of preliminary fact. ██ In the first place, as we stated in *Edwards,* the "mere possibility or subjective anticipation" of litigation is insufficient; it is necessary that there be proof of "some *actual verbalization* of the danger that a given controversy may turn into a lawsuit . . . ." (*Edwards, supra,* 53 Cal.App.4th at pp. 35, 34, italics added.) Second, even though "[i]t is not necessary that a party make an actual 'threat' of litigation," there must be "a serious, good faith proposal." (*Id.* at p. 35.) Third, the contemplated litigation must be *imminent.* (*Ibid.*) Although "[t]he classic example of an instance in which the privilege would attach to prelitigation

communications is the attorney demand letter threatening to file a lawsuit if a claim is not settled," it is not the mere *threat* of litigation that brings the privilege into play, but rather the actual good faith contemplation of an imminent, impending resort to the judicial system for the purpose of resolving a dispute. (*Id.* at pp. 35-36 & fn. 10.) "[B]ecause the privilege does not attach prior to the actual filing of a lawsuit unless and until litigation is seriously proposed *in good faith* for the purpose of resolving the dispute, even a threat to commence litigation will be insufficient to trigger application of the privilege if it is actually made as a means of inducing settlement of a claim, and not in good faith contemplation of a lawsuit. This is a question of fact that must be determined before the privilege is applied. [Citations.]" (*Id.* at p. 35, fn. 10, italics in original.)

 On its face, the May 24, 1994, letter from Fairfield's attorneys to the Herald does not expressly threaten to file a lawsuit if the Herald failed to publish a retraction. Although, in language closely tracking that of section 48a, Fairfield's attorneys "demand" the publication of a "correction within three (3) weeks of receipt of this letter . . . in substantially as conspicuous a manner" as Eisenberg's original articles, the letter twice repeats that it was not written "out of a desire to litigate this matter," but "in the interest of presenting correct and accurate information" and "to restore" Fairfield's "good name." There is no evidence to indicate either Fairfield or respondents themselves actually contemplated imminent resort to the courts or the judicial system to resolve their dispute, a fact acknowledged at oral argument by counsel for respondents. On this record, we cannot say whether the Fairfield demand letter was "merely a negotiating tactic," written as "a tactical ploy to negotiate a bargain" or induce the settlement of a claim; or a good faith suggestion, made "under the actual threat of impending litigation," that the controversy would imminently turn into a defamation lawsuit unless the demanded retraction was promptly published. (*Edwards, supra,* 53 Cal.App.4th at pp. 35, 36) The letter is in fact susceptible to interpretation as either of these possibilities.

Moreover, any application of the litigation privilege must satisfy the ultimate justification for the privilege, by encouraging the free exercise of the parties' fundamental right of resort to the courts for assistance in the ascertainment of truth and the resolution of their disputes. (*Silberg, supra,* 50 Cal.3d at pp. 212-214; *Edwards, supra,* 53 Cal.App.4th at pp. 29, 33, 35-36.) In this regard, it is important to bear in mind that the question presented here is not whether the privilege applies to the demand letter, but whether it covers the *retraction* published *in response to* the demand letter. The retraction was published not to obtain access to the courts, but to *avoid* litigation. Applying the privilege here would serve, not the purpose of encouraging free

access to the courts for assistance in resolving a dispute and ascertaining the truth, but instead the entirely separate goal of encouraging a settlement. As we pointed out in *Edwards*, this purpose, while entirely laudable, is totally unrelated to the rationale underlying the litigation privilege. Applying the privilege in such a context may actually serve to undermine or defeat the purposes of the privilege itself. (*Edwards, supra*, 53 Cal.App.4th at pp. 33-34, 36-37.)

To sum up: in order to take advantage of the litigation privilege, respondents must establish that either Fairfield or they themselves seriously and in good faith proposed imminent access to the courts as a means of resolving their dispute. (*Edwards, supra*, 53 Cal.App.4th at pp. 34-39; Rest.2d Torts, § 586, com. e, p. 248; *id.*, § 587, com. e, p. 250; *id.*, § 588, com. e, p. 251.) Although respondents assert their retraction was published in response to a letter they perceived as a section 48a demand, the record contains no declaration confirming either that Fairfield seriously and in good faith intended to file a lawsuit, or that respondents themselves actually contemplated imminent litigation. At most, it appears respondents intended to protect themselves from *potential* damages and *avoid* litigation with Fairfield by publishing the retraction. Nowhere in the record is there evidence respondents contemplated anything more than the mere possibility that Fairfield might be considering a lawsuit. Respondents cannot gain the protection of the privilege to protect their own communications merely by establishing that they anticipated a potential for litigation. As we have held, "the privilege only arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a *proposed proceeding* that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute. [Citation.]" (*Edwards, supra*, 53 Cal.App.4th at p. 39, italics in original.)

It remains a triable issue of fact whether, at the time of the retraction, imminent litigation was seriously proposed and actually contemplated in good faith as a means of resolving the dispute between respondents and Fairfield. While we can imagine situations in which a given retraction might be protected by the litigation privilege, too many issues of fact surround the applicability of the privilege in this case to support the granting of summary judgment on that basis here. The trial court therefore erred in granting summary judgment on the basis of the privilege.[10]

## STATEMENTS OF OPINION OR FACTUAL TRUTH NOT DEFAMATORY

 The trial court sustained respondents' motion for summary judgment with respect to the allegedly defamatory statements in Hunt's article

---

[10]Respondents apparently concede that Hunt's article published in the Herald on June 19, 1994, was unprotected by the litigation privilege of section 47(b). The concession is well taken. At the very least, the same triable factual issues raised by the retraction exist with

published in the Herald on June 19, 1994, on the grounds these statements were either substantially true or else were nonactionable statements of opinion. Although we have concluded that triable issues of material fact bar summary judgment with respect to the applicability of the litigation privilege to the retraction, the question remains whether there is any triable issue of material fact as to whether any statements in the retraction could be considered defamatory in the first place. Because the trial court thought the retraction was privileged under section 47(b), it did not reach this issue. We conclude both that the trial court was correct in ruling that the statements in Hunt's June 19 article were not defamatory, and that the statements in the retraction were similarly not defamatory as a matter of law.

Eisenberg claims the following statement in the Hunt article of June 19 was defamatory: "Reporting in this newspaper, which was inaccurate and unfair and lacked balance, helped spur the [Golden Eagle] controversy."[11] The statement that certain reporting had been "inaccurate" is a verifiable statement of fact. In defamation actions generally, factual truth is a defense which it is the defendant's burden to prove. ██ In a defamation action against a newspaper by a private person suing over statements of public concern, however, the First Amendment places the burden of proving falsity on the *plaintiff*. (*Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 768-769 [106 S.Ct. 1558, 1559-1560, 89 L.Ed.2d 783]; *Smith* v. *Maldonado* (1999) 72 Cal.App.4th 637, 646 & fn. 5 [73 Cal.App.4th 41j, 85 Cal.Rptr.2d 397].) As a matter of constitutional law, therefore, media statements on matters of public interest, *including* statements of *opinion* which reasonably imply a knowledge of facts, "must be provable as false before there can be liability under state defamation law." (*Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1, 18-20 [110 S.Ct. 2695, 2705-2707, 111 L.Ed.2d 1] (*Milkovich*).) Whether a statement contains provably false factual assertions is a question of *law* for the trial court to decide. (*Copp* v. *Paxton* (1996) 45 Cal.App.4th 829, 837 [52 Cal.Rptr.2d 831] (*Copp*); *Weller* v. *American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 999-1002 & fn. 9 [283 Cal.Rptr. 644].)

██ The statement in Hunt's published Herald article that previous reporting had been "inaccurate" was not provably false. Eisenberg admitted in deposition that although he had *intended* to convey the impression that certain "accusations created an atmosphere of doubt and suspicion" about

---

respect to the question whether the statements made in the subsequent Hunt article could be considered privileged under section 47(b).

[11]Nowhere in *either* the Hunt article or the retraction was Eisenberg identified by name. The Hunt article did not even identify the titles or dates of the articles in which the "inaccurate and unfair" reporting was published.

"favoritism," "influence-peddling" and the "integrity" of the City government, his *only* identified source for these alleged "accusations"—Rogers—never actually made them. Eisenberg also admitted that Fairfield himself did not hire Levish, contrary to what Eisenberg reported. Neither was there any factual basis for the statements in Eisenberg's article implying that it was Rogers who had "lodged" the "accusations of favoritism and influence-peddling" with the Alameda County District Attorney or grand jury, when in fact Rogers had repeatedly told Eisenberg that no one had done anything illegal and the only one who had made any accusations of illegality to the district attorney was Eisenberg himself. Clearly, and as a matter of law, Eisenberg cannot establish that the statement in Hunt's article that previous reporting had been "inaccurate" was provably false.

On its face, the statement that certain reporting had been "unfair and lacked balance" was one of opinion, not fact.[12] **(8)** It is an essential element of defamation that the publication be of a false statement of *fact* rather than opinion. (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425]; *Campanelli* v. *Regents of University of California* (1996) 44 Cal.App.4th 572, 578 [51 Cal.Rptr.2d 891]; *Jensen* v. *Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 970 [18 Cal.Rptr.2d 83].) Once again, the issue whether a communication was a statement of fact or of opinion is a question of law to be decided by the court. (*Copp, supra,* 45 Cal.App.4th at p. 837; *Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].)

In making the distinction between provably false factual assertions and nonactionable opinion, the courts have defined as opinion any " 'broad, unfocused and wholly subjective comment.' " (*Copp, supra,* 45 Cal.App.4th at p. 837, quoting *Fletcher* v. *San Jose Mercury News* (1989) 216 Cal.App.3d 172, 191 [264 Cal.Rptr. 699].) Under the common law privilege of fair comment, an honest expression of *opinion* on matters of public interest is privileged. (*Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 416 [46 Cal.Rptr. 135], disapproved on other grounds in *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 732-733, fn. 18 [257 Cal.Rptr. 708, 771 P.2d 406]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 548, p. 644.) On the other hand, if a statement of opinion implies a knowledge of facts which may lead to a defamatory conclusion, the implied facts must themselves be true. In such a case, the dispositive question is whether a reasonable factfinder could conclude the published statements *imply* a provably false assertion of fact. (*Milkovich, supra,* 497 U.S. at pp. 18-20 [110 S.Ct. at pp. 2705-2707]; *Okun* v. *Superior Court* (1981) 29 Cal.3d 442,

---

[12]At the hearing on respondents' motion for summary judgment, counsel for Eisenberg conceded that the statement that previous reporting "lacked balance" was an opinion.

451-452 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Copp, supra,* 45 Cal.App.4th at p. 837.)

 Whether or not the statement in Hunt's June 19, 1994, article that previous reporting had been "unfair and lacked balance" *implied* knowledge of unstated facts, the statement was not actionable for the same reasons it was not actionable for Hunt to state that certain previous reporting in the Herald had been "inaccurate": any such factual implication was not *provably false.* Accordingly, the trial court was correct in granting summary judgment as to respondents' publication of Hunt's article.

With respect to the retraction, Eisenberg claims four statements therein were defamatory: (1) the articles "published May 8 and May 15 . . . contained inaccurate and misleading information" about Golden Eagle, Fairfield and the Alameda County Grand Jury; (2) "[t]here is no evidence that Fairfield was involved in improper, corrupt or illegal activities related to" Golden Eagle, and the Newspaper "regret[s] any insinuation that Fairfield or anyone connected with" Golden Eagle was "engaged in any acts of collusion, illegal or otherwise"; (3) "[t]he May 8 article should have made it clear that it was the reporter himself who presented information concerning [Golden Eagle] to an assistant district attorney, who agreed to forward the information to the grand jury"; and (4) Levish was hired by Golden Eagle owners Currin and Timm, not by Fairfield, and "[a]ny insinuation from this passage that Fairfield engaged in improper and unethical behavior concerning [Golden Eagle] is incorrect, and we regret the errors in this regard." For the same reasons discussed with respect to Hunt's June 19, 1994, article, none of these statements in the retraction was defamatory.

The statement that the May 8 and May 15 articles "contained inaccurate and misleading information" about Golden Eagle, Fairfield and the Alameda County grand jury, like the parallel statement in the Hunt June 19 article, is not provably false. Eisenberg reported as *fact* that Rogers had made accusations of "favoritism," "influence-peddling," and the lack of "integrity" in the City government, and clearly implied that Rogers had "lodged" these accusations with the Alameda County Grand Jury. Because these reported "facts" were false, Eisenberg cannot as a matter of law prove that the retraction's characterization of them as "inaccurate" and "misleading" was itself false.

The retraction's statement that "[t]here is no evidence that Fairfield was involved in improper, corrupt or illegal activities related to" Golden Eagle is similarly a statement of fact that Eisenberg cannot prove false. To the contrary, the record shows that when asked to produce evidence to support his insinuations about the "stink of corruption," "accusations of favoritism

and influence-peddling," and the grand jury's purported interest in these "accusations," Eisenberg was simply unable to do so. On its face, the Newspaper's statement in the retraction that it "regret[s] any insinuation that Fairfield or anyone connected with" Golden Eagle was "engaged in any acts of collusion, illegal or otherwise" is a statement of fact that Eisenberg cannot prove false. Indeed, the very publication of the retraction itself is ample evidence of the Newspaper's "regret."

The retraction's statement that the May 8 article "should have made it clear" that it was the reporter himself who presented information on Golden Eagle to an assistant district attorney, who then agreed to forward the information to the grand jury, is a nonactionable statement of opinion. Eisenberg does not dispute the *fact* that it was he, and not Rogers, who contacted the Alameda County District Attorney's office and tried to interest it in initiating a grand jury investigation of Golden Eagle. The Newspaper was clearly entitled to its opinion that Eisenberg *should have* revealed that fact rather than falsely insinuating that Rogers or someone else had "lodged" these accusations with the district attorney. That opinion is not actionable.

Finally, it is an undisputed *fact* that Levish was hired by Golden Eagle owners Currin and Timm, and not by Fairfield. Because it is demonstrably *true*, it cannot be defamatory. The additional statement declaring "incorrect" "[a]ny insinuation" that Fairfield "engaged in improper and unethical behavior" concerning Golden Eagle is, once again, not provably false. ▉▉ ▉▉▉ Because neither this statement nor any other statements in the retraction contained provably false factual assertions, the trial court was *required* to grant summary judgment to respondents on their motion for summary judgment.[13]

### EMPLOYMENT TERMINATION CLAIMS

The trial court also granted summary judgment on Eisenberg's various claims arising from the termination of his employment at the Herald. On appeal, he contends that material issues of fact exist as to (1) the existence of an implied-in-fact contract that his employment could only be terminated for

---

[13]The trial court also granted summary judgment as to Eisenberg's second cause of action, alleging that respondents had placed him in a "false light," on the same grounds as it had granted summary judgment with regard to the defamation cause of action. When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action. (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]; *Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1136 [212 Cal.Rptr. 838].) The trial court was correct in granting summary judgment on Eisenberg's false light claim for the same reasons its grant of summary judgment on the first cause of action was correct.

cause; (2) alleged breach of an implied covenant of good faith and fair dealing; and (3) alleged wrongful termination in violation of his rights under the First Amendment and the California labor law. These contentions are all meritless.

### Breach of Implied-in-fact Contract of Employment

 Eisenberg argues that his termination breached an implied-in-fact contract to terminate only for cause, and the trial court erred in granting summary judgment on this cause of action. The trial court determined on the basis of undisputed evidence that Eisenberg's contract was terminable at will, and Eisenberg had failed to produce any admissible evidence of a contract, either express or implied, that could only be terminated for cause. The trial court did not err.

 Under Labor Code section 2922, "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month." Under this statute, an employee's term of employment, when not otherwise specified in an employment contract, written document or oral agreement, is considered a term that may be terminated at will by either party. Thus, in the absence of any evidence of the duration or term of employment under a written or oral agreement, there is a statutory presumption that employment is terminable at will, and a contract of employment may be ended at any time at the option of either party. (*Haycock* v. *Hughes Aircraft Co.* (1994) 22 Cal.App.4th 1473, 1488 [28 Cal.Rptr.2d 248] (*Haycock*); *Hillsman* v. *Sutter Community Hospitals* (1984) 153 Cal.App.3d 743, 749 [200 Cal.Rptr. 605]; *Hoy* v. *Sears, Roebuck & Co.* (N.D.Cal. 1994) 861 F.Supp. 881, 884-885 (*Hoy*).)

This presumption of at-will employment may be rebutted only by evidence of an express or implied agreement between the parties that the employment would be terminated only for cause. The existence of an implied promise to discharge an employee only for good cause is generally, but not always, a question of fact for the jury. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 668 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*); *Haycock, supra,* 22 Cal.App.4th at p. 1488; *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 324-325 [171 Cal.Rptr. 917]; *Hoy, supra,* 861 F.Supp. at p. 885.) On the other hand, if the facts are undisputed and admit of only one conclusion, then summary judgment may be entered on issues that otherwise would be submitted to the jury. Thus, the issue of the existence of an implied-in-fact contract not to terminate except for good cause may appropriately be resolved as a matter of law given the undisputed

facts of a particular case. (*Davis* v. *Consolidated Freightways* (1994) 29 Cal.App.4th 354, 366 [34 Cal.Rptr.2d 438] (*Davis*); *Tollefson* v. *Roman Catholic Bishop* (1990) 219 Cal.App.3d 843, 855-856 [268 Cal.Rptr. 550], disapproved on other grounds in *Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 474, fn. 5 [46 Cal.Rptr.2d 427, 904 P.2d 834]; *Miller* v. *Pepsi-Cola Bottling Co.* (1989) 210 Cal.App.3d 1554, 1558 [259 Cal.Rptr. 56] (*Miller* v. *Pepsi-Cola*); *Hoy, supra,* 861 F.Supp. at p. 885.)

To raise a triable issue of material fact and defeat an employer's motion for summary judgment based on the presumption of at-will employment, a plaintiff must produce competent evidence of an agreement that he or she could not be discharged without good cause. (*Gould* v. *Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1151-1153 [37 Cal.Rptr.2d 718] (*Gould*); *Davis, supra,* 29 Cal.App.4th at pp. 366-369.) In determining the existence of such a promise of termination only for cause, we look to the entire relationship of the parties, including such factors as the terms of any relevant application for employment, employee handbook or manual; the personnel policies and practices of the employer; the employee's longevity of service; actions or communications by the employer constituting assurances of continued employment; and the practices of the industry in which the employee is engaged. (*Foley, supra,* 47 Cal.3d at pp. 677-680; *Gould, supra,* 31 Cal.App.4th at pp. 1151-1152; *Haycock, supra,* 22 Cal.App.4th at p. 1488; *Miller* v. *Pepsi-Cola, supra,* 210 Cal.App.3d at pp. 1557-1558; *Hoy, supra,* 861 F.Supp. at p. 885.) A contract requiring termination only for cause will not be implied if there is an express writing providing to the contrary. There cannot be a valid express contract and an implied contract, each embracing the same subject, but compelling different results. (*Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613] (*Shapiro*); *Wal-Noon Corp.* v. *Hill* (1975) 45 Cal.App.3d 605, 613 [119 Cal.Rptr. 646]; *Hoy, supra,* 861 F.Supp. at p. 885.)

 In this case, there is overwhelming evidence in support of the presumption that Eisenberg's employment was at will. The employment application, which appellant signed on May 3, 1994, explicitly stated his understanding and acknowledgment that (a) "unless otherwise defined by applicable law, any employment relationship with this organization is of an 'at will' nature, which means that the Employee may resign at any time and the Employer may discharge Employee at any time with or without cause"; and (b) "this 'at will' employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization." In addition, the employee handbook Eisenberg acknowledged receiving on May 25, 1994, set out a 90-day probationary period during which the employer could

terminate an employee's employment if the latter "fails to meet the expectations of the job"; and restated the Newspaper's personnel policy and practice that unless an employee was hired for a specified period of time or "an agreement says otherwise," all employment was "at will," meaning it could be terminated "at any time, without cause . . . ."

Eisenberg signed his name to the employment application and to a form acknowledging his understanding that the employee handbook stated the Newspaper's employment "polices and procedures." In so doing, Eisenberg explicitly acknowledged that he understood his employment to be at will. In his deposition, Eisenberg conceded both that the statement on the employment application was consistent with his understanding of his employment with the Herald, and that neither before nor after signing it did anyone tell him anything that contradicted the "at-will" statement on the application. Eisenberg nevertheless points out that he signed both the employment application and the receipt form for the employee handbook *after* the Herald had already hired him; neither the application nor the handbook was supported by any independent consideration; neither document covered his position or his salary; and the application was on a standardized form that did not contain an integration clause. Citing these facts and relying on *Seubert* v. *McKesson Corp.* (1990) 223 Cal.App.3d 1514, 1519-1520 [273 Cal.Rptr. 296] (*Seubert*), Eisenberg argues that neither the employment application nor the employee handbook constituted an enforceable, integrated contract or was intended to represent the entire employment agreement between the parties; and his signatures on those documents did not bind him to at-will employment.

It is true that neither document was an integrated contract. Indeed, neither purported to be. However, this fact does not render these written documents stating the Herald's policy of at-will employment, and Eisenberg's signatures acknowledging that policy, any less significant to this case. To the contrary, these signed documents provide strong evidence in support of the statutory *presumption* that Eisenberg's employment, which admittedly had no specified term, was terminable at will. The fact the application for employment and the employee handbook did not *themselves* constitute an integrated employment contract does not undermine their materiality as evidence of the nature of Eisenberg's employment, in the absence of *countervailing factual evidence* of an implied-in-fact contract not to discharge in the absence of good cause. (*Davis, supra,* 29 Cal.App.4th at pp. 366-369; *Haycock, supra,* 22 Cal.App.4th at pp. 1488-1491; *Shapiro, supra,* 152 Cal.App.3d at pp. 480-482; *Hoy, supra,* 861 F.Supp. at pp. 885-886; cf. *Seubert, supra,* 223 Cal.App.3d at pp. 1519-1520 [presumption of

at-will employment may be rebutted by *evidence* supporting the actual existence of an implied contract requiring cause for termination].)[14]

Here, instead of offering such factual evidence, Eisenberg merely makes general allegations in support of his assertion that he *understood* respondents *to imply* he would not be terminated without good cause. Specifically, Eisenberg alleges that: (a) he provided samples of his work to respondents to obtain assurance they were "comfortable" with his "hard-hitting, flamboyant style of journalism"; (b) respondents recognized and acknowledged Eisenberg's status as an experienced and established investigative journalist; (c) respondents assured him he would ultimately be named a "columnist," even though he was not hired as such; (d) respondents reassured Eisenberg about the financial stability of the Herald and its parent company; (e) respondents never told him he was hired at will or was subject to firing within a 90-day probationary period; (f) respondents told him what salary, vacation, health and pension benefits he would have if he came to work at the Herald; and (g) Eisenberg himself would not have left his previous employment at a different newspaper and gone to work at the Herald if *he* had not subjectively *believed* he would have more job security, increased opportunities for advancement, and better pension and retirement benefits at the Herald.

Significantly, in none of these allegations does Eisenberg offer *any evidence* of an actual promise that he would be employed for a specific term or as long as he was doing a good job, or that he could only be terminated for good cause. While Eisenberg and Hunt may have discussed salary and benefits and agreed that he would be a "senior writer," there is *no* evidence Hunt or anyone else ever told him he would have job security or could not be terminated without cause. To the contrary, Eisenberg admits neither Hunt

[14]The case of *Seubert, supra,* 223 Cal.App.3d 1514, upon which Eisenberg relies, is factually distinguishable from this case for a number of reasons. In *Seubert,* the terminated employee-plaintiff had been employed by the defendant employer for four years at the time of his termination. During that period, the employer had implemented an *express* personnel policy governing termination of employees for failure to meet specific quotas. Finally, the employment application form on which the employer in *Seubert* relied in arguing that the employment was "at will" did not expressly state that employment could be terminated for any reason or without cause. The *Seubert* court specifically recognized that such language stating employment could be terminated "for any reason" might preclude a separate collateral agreement requiring good cause for termination. (*Id.* at p. 1520, citing *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 271 [235 Cal.Rptr. 279].)

In contrast, in this case Eisenberg had been employed at the Herald for *less than one month* at the time of his termination, well within the 90-day probationary period set out in the employee handbook. There was *no evidence* that either the Herald or the parent Newspaper had any personnel policy other than at-will employment of individuals employed for no specified term. To the contrary, both the employment application *and* the employee handbook expressly stated that employment for an unspecified duration could be terminated at any time "without cause."

nor anyone else ever said *anything* about the duration of his employment. Neither has Eisenberg produced any evidence of any policy or practice, either in the newspaper industry in general or at the Herald in particular, of termination of employees only upon good cause.

Instead, Eisenberg's allegations of unspecified "representations" or "understandings" about his tenure are all "conclusory," in that they purport to establish an ultimate conclusion by inference without alleging the evidentiary *facts* necessary actually to demonstrate that conclusion. (3 Oxford English Dict., *supra*, at p. 667.) Because these conclusory assertions fail to provide the factual *evidence* necessary to overcome the presumption of at-will employment, they are insufficient as a matter of law either to controvert that presumption, or to support a cause of action for breach of implied-in-fact contract. (*Gould, supra,* 31 Cal.App.4th at pp. 1151-1153; *Davis, supra,* 29 Cal.App.4th at pp. 366-369; *Shapiro, supra,* 152 Cal.App.3d at p. 482; *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290, 304 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015].) In any event, Eisenberg could not reasonably have relied upon any allegedly implied promises by respondents which contradicted the *express* provisions of both the application for employment he signed and the employee handbook. (*Shapiro, supra,* 152 Cal.App.3d at p. 482.) Having been terminated after *less than one month* of employment, well within the 90-day probationary period set out in the employee handbook, Eisenberg certainly cannot rely on longevity of service as a factor in support of the existence of an implied contract of employment. (*Gould, supra,* 31 Cal.App.4th at pp. 1151-1152; *Davis, supra,* 29 Cal.App.4th at p. 368.)

In sum, respondents were entitled to rely on the presumption of at-will employment unless rebutted by actual evidence of an implied-in-fact contract of employment providing otherwise. They provided evidence strongly supporting their claim that Eisenberg's employment in fact was at will. Eisenberg failed to negate either the presumption or respondents' actual practice of at-will employment. Thus, Eisenberg has failed to demonstrate there was any triable issue of material fact to support his claim of an implied-in-fact contract. Summary judgment on Eisenberg's fourth cause of action for breach of such a contract was therefore proper.

### Breach of Implied Covenant of Good Faith and Fair Dealing

Having failed to raise a triable issue of fact as to his at-will status, Eisenberg cannot raise a triable issue on his claim for breach of the implied covenant of good faith and fair dealing. "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the

contract, not to protect some general public policy interest not directly tied to the contract's purposes." (*Foley, supra,* 47 Cal.3d at p. 690.) Thus, the implied covenant does no more than protect the right to enjoy the benefits of the contract. An at-will employee cannot use the implied covenant to create a for cause employment contract where none exists. (*Ibid.; Gould, supra,* 31 Cal.App.4th at pp. 1151-1152; *Flait* v. *North American Watch Corp.* (1992) 3 Cal.App.4th 467, 480-481 [4 Cal.Rptr.2d 522].) Because Eisenberg cannot show that a contractual covenant or promise was violated, the trial court was correct in granting summary judgment on his fifth cause of action for breach of the implied covenant of good faith and fair dealing.

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

Eisenberg also contends the trial court erred in granting summary judgment as to his third cause of action alleging wrongful termination in violation of public policy. There are two prongs to Eisenberg's public policy contention. First, he argues his termination was a violation of his rights under the First Amendment. Second, he contends his termination was in violation of Labor Code section 970. There is no merit to either contention.

With regard to Eisenberg's First Amendment claim, he has not cited any federal or California state decisional authority under either the United States or California State Constitutions holding that a newspaper publisher cannot terminate the employment of a reporter, hired on an at-will basis, based on dissatisfaction with the content of or views expressed by the reporter's writing. To the contrary, the courts have long held that the right to control the content of a privately published newspaper rests entirely with the newspaper's publisher. The First Amendment protects the newspaper itself, and grants *it* a virtually unfettered right to choose what to print and what not to. Although a news reporter obviously has First Amendment rights as well, those rights do not guarantee employment. (*Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 254-258 [94 S.Ct. 2831, 2837-2840, 41 L.Ed.2d 730]; *Columbia Brodcasting* v. *Democratic Comm.* (1973) 412 U.S. 94, 117 [93 S.Ct. 2080, 2093-2094, 36 L.Ed.2d 772]; *Collard* v. *Smith Newspapers, Inc.* (S.D.W.Va. 1996) 915 F.Supp. 805, 809-813; *Yovino* v. *Fish* (1989) 27 Mass.App. 442 [539 N.E.2d 548, 550]; *Veno* v. *Meredith* (1986) 357 Pa.Super. 85 [515 A.2d 571, 573-574, 581].)

Thus, it was the Herald's right to set and enforce its own standards for acceptable and responsible reporting. Eisenberg was fired because he did not meet those standards. Although Eisenberg has a First Amendment right to express his own views, he does not have a right to publish them in the Herald against its wishes. His termination was not a violation of his First Amendment rights.

Eisenberg's claim under Labor Code section 970 is similarly meritless. That statute prohibits employers from inducing employees "to change from one place to another . . . for the purpose of working in any branch of labor, through or by means of knowingly false representations" concerning the nature, duration or conditions of employment.

The statute is inapplicable to this case. First, it requires the employee to demonstrate that his or her employer made "knowingly false representations" concerning the nature, duration or conditions or employment. As seen, there is no evidence of such misrepresentations in this case. Eisenberg admitted that no one at the Herald, including Hunt, ever said anything about the duration of his employment or told him anything in conflict with either the employment application or the employee handbook. Both of those documents indicated that Eisenberg was an at-will employee. Because there was no evidence of any misrepresentation about the duration of Eisenberg's employment, his Labor Code section 970 claim must fail. (*Tyco Industries Inc.* v. *Superior Court* (1985) 164 Cal.App.3d 148, 155 [211 Cal.Rptr. 540].)

Moreover, under the statute an employee must establish that the employer induced him or her to relocate or change residences. (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 637 [49 Cal.Rptr.2d 377, 909 P.2d 981]; *Collins* v. *Rocha* (1972) 7 Cal.3d 232, 239 [102 Cal.Rptr. 1, 497 P.2d 225]; *Seubert, supra,* 223 Cal.App.3d at pp. 1521-1523.) There was no such evidence in this case.

## OTHER CLAIMS

Finally, Eisenberg contends that the trial court erred in granting summary judgment on his sixth cause of action for fraud because of the existence of alleged material issues of fact. Specifically, Eisenberg asserts he has offered evidence that during the negotiations on his employment, respondents impliedly promised not to terminate him except for good cause, while deliberately failing to disclose either the Newspaper's 90-day probationary period or the fact he was being hired on an at-will basis.

Once again, Eisenberg is wrong. As seen, Eisenberg has failed to offer evidence sufficient to establish a triable issue of material fact on the issue of whether respondents made any promises about the duration of Eisenberg's employment, or whether he could be fired only for cause. Having failed to demonstrate that respondents promised to employ him on anything other than an at-will basis, or made any misrepresentations to him whatsoever, there is no substance to his allegation of fraud. (*Orient Handel* v. *United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684, 692-694 [237 Cal.Rptr.

667].) The trial court properly granted summary judgment on this cause of action.

## DISPOSITION

The judgment is affirmed. Appellant Eisenberg shall pay respondents' costs on appeal.

Corrigan, J., and Walker, J., concurred.

A petition for a rehearing was denied October 19, 1999, and appellant's petition for review by the Supreme Court was denied January 13, 2000.