[No. A043256. First Dist., Div. Four. Sept. 24, 1990.]

RICHARD SEUBERT, Plaintiff and Appellant, v.
McKESSON CORPORATION et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I2 and II2.

COUNSEL

Thomas F. Doyle for Plaintiff and Appellant.

Robert A. Seligson, Littler, Mendelson, Fastiff & Tichy, Richard N. Hill and Terence N. Church for Defendants and Appellants.

OPINION

PERLEY, J.—McKesson Corporation and 3PM (appellants) appeal from a judgment in favor of Richard Seubert in this wrongful termination action. Appellants contend that: (1) the judgment based on breach of the implied covenant of good faith and fair dealing is invalid because the employment

agreement was at will; (2) there is insufficient evidence to support the misrepresentation cause of action; and (3) the damages for misrepresentation are excessive and unsupported by the evidence. Seubert has cross-appealed contending that pursuant to Labor Code sections 970 and 972 he is entitled to double damages and that the issue of punitive damages should have been submitted to the jury. We conclude that Seubert's claim based on Labor Code sections 970 and 972 has merit and therefore modify the judgment to reflect double damages.

## FACTS

In 1981, Seubert commenced employment with 3PM[1] as a salesman selling an on-line computer system to retail pharmacies in several eastern states. Prior to being offered employment, Seubert signed an application for employment which contained the following language: "I understand and agree, if hired, my employment is for no definite period and may, regardless of the date of payment of my wages and salary, be terminated at any time without any prior notice."

In November 1982, Seubert was offered the position of regional sales manager for the western United States including California, Oregon, Washington, Hawaii, and Colorado. The position offered a substantial increase in salary and commissions. Because Seubert was aware that there had been marketing difficulties for 3PM's stand-alone system in California, he inquired and was told that systems were in place and operational in California, that 3PM was providing customer service and that 3PM had received an endorsement from McKesson Corporation. Based upon these representations, Seubert accepted the position. He moved to California in December 1982; his family followed him in May 1983. He sold his home in Erie, Pennsylvania and purchased one in Tracy, California.

By May 1983, Seubert had sold several systems in California. When the first system was installed, he learned from a customer that the formulary—that listing of prescription drugs that has been approved by the state for reimbursement to pharmacists—was not in the system. The formulary is a basic necessity for a pharmacy computer system. Other pharmacies that had purchased the system also subsequently learned that the formulary and certain other "edits" such as prior authorization numbers were not in place in the system. Seubert informed 3PM of the problem and spent considerable time with customer service and with the customers in order to appease them so that they would retain the systems. Seubert was informed by 3PM that the formulary would be corrected and he related this information to his

---

[1] 3PM was acquired by McKesson in October 1983.

customers. Several customers, however, subsequently returned the systems when problems were not corrected by 3PM. As a result of the returns, Seubert lost commissions on those sales.

In December 1983, Thomas Cook, then vice-president of pharmacy of 3PM, instructed Seubert to sell the stand-alone system in Hawaii. Although Seubert advised Cook that customer service did not have the capability to address the Hawaii market, Cook told Seubert to go to Hawaii to make sales. In January 1984, Seubert put on a series of demonstrations of the stand-alone systems and made a dozen sales. Seubert advised 3PM, however, that the sales were conditional upon the formulary being in the system at the time of installation, the availability of customer service until 4:30 p.m. Hawaii standard time and installation of the systems within six months. Seubert advised Cook orally and in writing that he did not want the Hawaii sales contracts to be accepted unless 3PM could comply with the conditions. 3PM accepted the contracts. 3PM thereafter installed the systems although no formulary was in place and customer service was lacking. With the exception of one or two customers, the systems were returned to 3PM.

For the fiscal year ending March 31, 1983, Seubert attained 280.9 percent of his sales quota, and for the fiscal year ending March 31, 1984, he reached 141.7 percent of his sales quota. Seubert earned $94,640.90 in 1983 and $85,663.74 in 1984. In 1984, customers began returning their systems in large numbers. Consequently, Seubert did not attain his sales quota.

On March 26, 1985, Seubert was informed that he was not at quota for two successive fiscal quarters and that he therefore had the option to resign or be fired. Seubert did not quit and was informed by letter dated March 29, 1985, that he was terminated. Seubert testified that if he had not had the problem with returned systems, he would have been at or above quota.

A personnel policy which was adopted on December 12, 1984, provided that sales people were to be terminated "if not at quota for two full quarters or letter of explanation is required." The policy was not intended to be retroactive. There was no written policy in force prior to December 1984.

After his termination, Seubert worked for General Computer, a competitor of 3PM. His compensation was $35,000 per year plus commissions and overrides. Seubert left that job after only five months because of several incidents in which 3PM advised his customers that he had been fired from 3PM and insulted him in front of his colleagues.

Seubert thereafter went to work for Digimedics but left that job after the company began to have financial difficulties. In October 1986, Seubert

commenced employment with PGT Trucking where at the time of trial he was earning $44,100 per year plus a 6 percent bonus. Following his termination, Seubert earned approximately $27,000 in 1985, $29,000 in 1986 and $37,000 in 1987.

Seubert commenced this action for breach of contract, misrepresentation and breach of the implied covenant of good faith and fair dealing in 1985. While the court upon Seubert's motion, dismissed the breach of contract claim at the outset of trial, the question of whether a contract of employment existed was submitted to the jury as a part of its special verdict on the breach of the implied covenant of good faith and fair dealing cause of action. Following a trial, the jury returned special verdicts in favor of Seubert on the breach of the implied covenant and misrepresentation causes of action. The trial court thereafter awarded judgment against appellants in the sum of $240,000.

## DISCUSSION

## I

1. *Implied Covenant of Good Faith and Fair Dealing*

■ Appellants contend that Seubert was an at-will employee and that therefore there could be no breach of the implied covenant of good faith and fair dealing because Seubert could be terminated with or without cause.

Appellants argue that Seubert's application for employment expressly indicates that his employment was at will. That application, however, was a standardized two-page form and it did not contain an integration clause. In *McLain* v. *Great American Ins. Companies* (1989) 208 Cal.App.3d 1476, 1484-1485 [256 Cal.Rptr. 863], the court found these factors significant in determining that there was an implied contract that the employee could only be discharged for cause. There, the court held that an employment application form which provided that employment could be terminated with or without cause was not an integrated agreement because the application was a standardized form, it did not cover either the employee's salary or position, it did not contain an integration clause and it stated that the terms and conditions could be changed at any time by the employer.

Appellants, however, rely on *Slivinsky* v. *Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 806 [270 Cal.Rptr. 585] where the court held that a written employment agreement which defined the employment as at will precluded a cause of action for breach of the implied covenant of good faith and fair dealing. There, the employee signed an employment application

and an employment agreement which stated that there was no express or implied agreement between the parties for any specific period of employment and the agreement stated that the parties each had the right to terminate employment with or without cause. The court determined that unlike the application form in *McLain*, these documents constituted an integrated employment contract.

Appellants' reliance on *Slivinsky* is misplaced. Here, there was no express employment agreement but only an application form. As in *McLain, supra,* the application form did not state Seubert's salary or position[2] and was a standardized two-page form. While it stated that employment was for no definite period and could be terminated at any time, it did not contain an integration clause and it did not state that employment could be terminated for any reason. (Cf. *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 271 [235 Cal.Rptr. 279] [court emphasized that the language "for any reason" in the termination clause of an employment agreement precluded a separate collateral agreement regarding reasons for termination].) Hence, despite the termination-at-will language in the employment application, other factors indicate that the application was not intended to be the entire employment agreement between the parties.

While there is a presumption that employment is terminable at will, that presumption may be superseded by a contract, express or implied, which limits the employer's right to discharge the employee. (Lab. Code, § 2922; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 665 [254 Cal.Rptr. 211, 765 P.2d 373].) The evidence here supports the existence of an implied contract requiring cause for termination. Prior to Seubert's termination, an express personnel policy governing termination of sales personnel was instituted. The policy provided that a salesperson could be terminated "if not at quota for two full quarters . . ." The existence of the policy supports Seubert's position that he could only be terminated for cause. (See *McLain, supra,* 208 Cal.App.3d at p. 1486 [personnel manual which provided that " 'new hires during their initial three months may be terminated for cause, providing they have received written warning . . . .' " supports jury's finding of implied contract.] While there was testimony that this policy was not to be applied retroactively, the record indicates that there had been an informal practice of terminating sales personnel if they were not at quota. There is therefore support for the jury's implied finding here that the employment contract between appellants and Seubert was not at will.

Appellants also argue that the jury's award of damages for breach of the implied covenant must be reversed in light of *Foley*. Contrary to appellants'

---

[2] We note that Seubert's salary and position were listed on the application in the section labeled "DO NOT WRITE BELOW THIS LINE" which was initialed and dated by an interviewer subsequent to Seubert's filing of the application.

argument, however, *Foley* does not preclude inquiry into an employer's motive for discharging an employee, but simply holds that tort damages are not available for breach of the implied covenant of good faith and fair dealing. (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at p. 700.) Here, the jury was asked to determine in its special verdict whether appellants had a legitimate reason to terminate Seubert's employment and whether appellants acted in good faith on an honest but mistaken belief that they had a legitimate business reason to terminate Seubert's employment. Neither inquiry was inappropriate under *Foley*. The jury was also permitted to award economic damages for breach of the implied covenant.[3] As the *Foley* court specifically approved of contract damages for breach of the implied covenant, we discern no error.

## 2. *Misrepresentation**

. . . . . . . . . . . . . . . . . . . . . .

## II

### *Seubert's Cross-appeal*

#### 1. *Labor Code Sections 970 and 972*

Seubert asserts that he is entitled to double damages pursuant to Labor Code sections 970 and 972.[5]

---

[3] The jury was instructed in the language of BAJI No. 10.54 that "[i]f you find defendants in breach of the implied covenant of good faith and fair dealing, you will award to plaintiff such damages as you find were legally caused to plaintiff by such breach. Such damages include: The value of the loss of compensation and benefits under the employment contract and consequentialy [*sic*] economic damages."

* See footnote, *ante*, page 1514.

[5] Labor Code section 970 provides: "No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning either: [¶] (a) The kind, character, or existence of such work; [¶] (b) The length of time such work will last, or the compensation therefor; [¶] (c) The sanitary or housing conditions relating to or surrounding the work; [¶] (d) The existence or nonexistence of any strike, lockout, or other labor dispute affecting it and pending between the proposed employer and the persons then or last engaged in the performance of the labor for which the employee is sought."

Section 972 provides in pertinent part: "In addition to such criminal penalty [see section 971], any person, or agent or officer thereof who violates any provision of section 970 is liable to the party aggrieved, in a civil action, for double damages resulting from such misrepresentations . . . ."

■ Labor Code section 970 prevents employers from inducing employees to move to, from, or within California by misrepresenting the nature, length or physical conditions of employment. (*Tyco Industries, Inc.* v. *Superior Court* (1985) 164 Cal.App.3d 148, 155 [211 Cal.Rptr. 540].) While it "was enacted to protect migrant workers from the abuses heaped upon them by unscrupulous employers and potential employers, especially involving false promises made *to induce migrant workers to move in the first instance,*" the courts have construed sections 970 and 972 to apply to other employment situations as well. (*Ibid.*; *Munoz* v. *Kaiser Steel Corp.* (1984) 156 Cal.App.3d 965, 980 [203 Cal.Rptr. 345].) "[N]othing in the statute restricts application of the statutory language to any particular class or kind of employment, and, absent some compelling indicia of legislative intent to so restrict the statutory ambit, we find no justification for restricting application of the statutory provisions to farm labor or other mass hiring situations." (*Munoz* v. *Kaiser Steel Corp., supra,* at p. 980.) We agree that the statute should be so construed. We also believe that in applying fundamental rules of statutory construction that consideration should be given to the statute's objective and remedial purpose. (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722].) The apparent purpose of sections 970 and 972 is to protect potential employees from being solicited to change employment by false representations concerning the nature or duration of employment. The statutory scheme is particularly addressed to preventing employers from inducing potential employees to move to a new locale based on misrepresentations of the nature of the employment. (*Tyco Industries, Inc.* v. *Superior Court, supra,* 164 Cal.App.3d at p. 155.)

■ The precise situation sought to be avoided by section 970 occurred here. Seubert was induced to move to California based on false representations concerning the nature of the regional sales manager position. Cognizant of the fact that 3PM had experienced marketing difficulties in the past, Seubert, prior to accepting the position in California, inquired and received false assurances regarding the position. 3PM misrepresented that the formulary for the stand-alone system was in place and that customer service would be provided to customers. Based on these misrepresentations, Seubert accepted a position which required him to relocate his home and family over 3,000 miles from Pennsylvania to California. As a result of 3PM's false representations, Seubert lost commission income and was terminated from his position because he was unable to reach his sales quota. Section 970 was thereby implicated and pursuant to section 972, Seubert is entitled to double damages.

The construction of a statute and whether it is applicable to a factual situation present solely questions of law. (*Dean W. Knight & Sons, Inc.* v. *State of California* ex rel. *Dept. of Transportation* (1984) 155 Cal.App.3d

300, 305 [202 Cal.Rptr. 44].) Although the trial court erred in determining that the Labor Code sections 970 and 972 were not applicable and hence the issue of double damages was not submitted to the jury, the record reflects that the jury specifically found that 3PM made false representations to induce Seubert to accept the position in California. Given the express findings by the jury, it is unnecessary to remand this case for a retrial on the limited issue of damages. ■ "Whenever an appellate court may make a final determination of the rights of the parties from the record on appeal, it may, in order to avoid subjecting the parties to any further delay or expense, modify the judgment and affirm it, rather than remand for a new determination." (*Sagadin* v. *Ripper* (1985) 175 Cal.App.3d 1141, 1170 [221 Cal.Rptr. 675].) We therefore modify the judgment to reflect double damages in accordance with Labor Code section 972.

2. *Punitive Damages**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

### DISPOSITION

The judgment is modified to reflect damages in the amount of $480,000. As so modified, the judgment is affirmed. Seubert to recover costs on appeal.

Anderson, P. J., and Poché, J., concurred.

---

*See footnote, *ante*, page 1514.