[No. D042200. Fourth Dist., Div. One. July 12, 2004.]

LEN AGOSTA, Plaintiff and Appellant, v.
N. ARTHUR ASTOR et al., Defendants and Respondents.

---

## COUNSEL

Grady and Associates, Dennis M. Grady and Kenneth W. Baisch for Plaintiff and Appellant.

Astor & Phillips, George R. Phillips, Jr., and Robert S. Gerstein for Defendants and Respondents.

---

## OPINION

**McCONNELL, P. J.—** The principal issue in this case is whether an employer who induces an employee to enter into an employment contract by intentionally promising compensation terms the employer never intended to honor may, as a matter of law, avoid tort liability for fraudulent inducement of contract because the contract contains an "at-will" provision that allows the employer to fire the employee at any time for any reason. The answer is, of course, no. Accordingly, we reverse, with directions, a judgment for defendants N. Arthur Astor, Astor Broadcast Group, North County Broadcasting Corporation, Orange Broadcasting Corporation and Susan Burke (collectively Astor when appropriate) entered after the court granted their motion for summary adjudication.

### FACTUAL AND PROCEDURAL BACKGROUND

Astor owns and operates radio stations KMXN in Orange County and KFSD in San Diego. Astor intended to change the format of the stations, and he hired Lee Weiman as the director of sales and authorized him to hire a sales team. Weiman had worked with plaintiff Len Agosta, and he introduced Agosta, then an account executive for Clear Channel Communications (Clear Channel), to Astor.

Agosta and Astor had a series of meetings in April 2001.[1] Agosta told Astor he wanted a position as the general sales manager for both stations, a base salary, commissions, an equity position and long-term employment. Agosta insisted on something in writing before giving Clear Channel notice.

---

[1] All following dates are in 2001 unless otherwise specified.

He advised Astor he already had offers from two other potential employers for long-term positions.

On April 17, Astor offered Agosta a position as general sales manager for the San Diego station only, a $6,000 base salary, a 5 percent commission on his own accounts and a bonus plan based on performance of the San Diego station. Astor expected Agosta to "carry a client list and act as an account executive." Agosta refused the offer. He told Astor he was "already working as an account executive with a much larger radio station, making over $150,000 per year, and therefore it was not economically feasible to move to the smaller San Diego station, doing the same work that I was currently doing with a compensation structure that would mean a significant loss in income." Agosta explained he recently purchased a home and could not make the mortgage payments under Astor's offer. When Agosta arose to leave, Astor asked him what he wanted. Agosta reiterated his expectations.

In an April 20 telephone call, Astor told Agosta he "should not receive overrides[2] for billings that were already on the books." Agosta agreed. In a telephone call later that day they agreed Agosta would be the general sales manager for both stations, and he would receive a base salary of $6,000 per month, a 2.5 percent override on all billings for both stations booked after his start date, a 1 percent equity based on accrued value of the stations and a bonus plan tied to the sales performance of both stations. Further, Astor would not require Agosta to carry his own account list.

Agosta asked Astor for a written offer before he gave Clear Channel notice. Astor accused Agosta of questioning his integrity and not trusting him, and he pressured Agosta to leave Clear Channel without a written offer. Astor insisted on a writing, and on April 20 Astor faxed to Agosta a document entitled "Compensation Packages." The document stated Agosta's title would be "General Sales Manager KMXN-FM/KFSD-FM," and he would receive a base salary of $6,000 per month, a "2.5 [percent] override on all billing booked on KMXN-FM/KFSD-FM post start date," bonuses at Astor's discretion and "1 [percent] equity based on value accrued [at both stations] from this date forward." The document did not address the length of employment. The parties signed the document that date, with the understanding Astor would draft a formal agreement.

On April 23, Agosta gave Clear Channel and his account clients oral notice of his change in employment.

On April 24, Astor presented Agosta with a document entitled "Compensation Plan." It provided Agosta was to receive a base salary of $6,000, "2.5

---

[2] An "override" is "a commission paid to managerial personnel on sales made by subordinates." (Merriam-Webster's Collegiate Dict. (10th ed. 1996) p. 830.)

[percent] on net collections of all billing booked on KMXN-FM/KFSD-FM effective start date of [his] employment," and a future "[b]onus plan . . . at Company's discretion." It varied from the April 20 document by making his right to an equity position contingent on meeting sales projections.

The agreement also provided: "This compensation plan supersedes and replaces any previous written or verbal agreement by the parties hereto. The above plan is a compensation guideline and becomes null and void upon termination of Agosta's employment with the Company. Company is an 'at will' employer, and either party may terminate employment upon notice to the other party or at a mutually agreed upon departure date. [¶] NOTE: If Agosta's employment is terminated at any time, all bonus amounts and commissions due will be prorated and payable to the termination date."

On April 24 Agosta discussed the Compensation Plan with Weiman. They believed the "at-will" provision "didn't really apply to us" since "we were hired in what we felt was a special capacity to turn the company around and launch a new station."

On April 25 Agosta telephoned defendant Burke, Astor's executive vice-president, and complained that the Compensation Plan tied together the equity and bonus issues. Burke said the Compensation Plan "would be interpreted so as to correlate with the earlier Agreement's terms," and as "long as the sales performance was reasonable, [Agosta] would receive [his] equity position." Agosta did not question Burke about the at-will provision.

On April 26 Agosta tendered a written resignation to Clear Channel, and April 27 was his last day of work.

On May 1, Agosta signed the Compensation Plan and began working for Astor. Three days later, Astor, through Weiman, notified Agosta he was required to carry an account list and act as an account executive. Astor also broached the subject with Agosta and he objected to new employment terms.

On May 22 Agosta learned that Astor had fired Weiman. The following day, Astor told Agosta he was reneging on the agreed terms of employment by, for instance, eliminating the overrides he was to receive on the accounts of sales agents and requiring him to start carrying an account list and act as an account executive. Agosta was shocked. He told Astor he recently purchased a home and would not have changed employment had he known Astor would repudiate the deal.

On May 24, Astor sent an e-mail to Agosta terminating his employment as of May 31. Astor offered to rehire Agosta as a sales manager for the San

Diego station only, with a base salary of $5,000, a 5 percent commission on his own accounts and bonuses based on the station's billings. Agosta refused the offer; it was worse than the offer he rejected on April 17.

Agosta sued Astor for intentional misrepresentation, negligent misrepresentation, "fraudulent inducement," breach of the implied covenant of good faith and fair dealing, and defamation. The first four causes of action are based on the theory Astor induced Agosta to leave Clear Channel and accept a new position with Astor by misrepresenting the length of employment and compensation terms. The defamation cause of action is based on alleged comments to third parties that Agosta "quit without notice after only three weeks."

Astor moved for summary judgment, or in the alternative summary adjudication, arguing Agosta cannot prove the elements of any of the first four causes of action because he signed an at-will employment agreement and parol evidence is inadmissible to alter that term. As to the defamation claim, Astor denied making any defamatory statement.

In opposing the motion, Agosta pointed out "[t]his is not a wrongful termination lawsuit." Agosta argued against application of the "at-will" employment provision, and also argued his fraud-based claims are not amenable to summary adjudication because he produced evidence showing Astor never intended to honor the agreed on compensation terms and his misrepresentations induced Agosta to leave Clear Channel and accept employment with Astor.

The court denied summary adjudication as to the defamation cause of action, but granted it as to the other causes of action on the ground the Compensation Plan unambiguously provided Agosta's employment was terminable at will, and thus he "could not have justifiably relied on defendants' representations of long-term employment." The court did not address the second prong of Agosta's misrepresentation claims, that Astor's false promises regarding compensation induced him to change employment to his detriment. Agosta then dismissed the defamation cause of action, and judgment was entered against him on March 21, 2003.

## DISCUSSION

## I

### *Standard of Review*

"A party may move for summary adjudication as to one or more causes of action within an action . . . if that party contends that the cause of action has

no merit . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).) " 'The aim of the procedure is to discover whether the parties possess evidence requiring the weighing procedures of a trial. [Citation.]' [Citation.] For a defendant to prevail on a summary adjudication motion, . . . [it] meets its 'burden of showing that a cause of action has no merit if [it] has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action . . . .' [Citation.] If the trial court concludes there is no triable issue of material fact and 'the sole remaining issue is one of law, it is the duty of the trial court to determine the issue of law. [Citation.]' " (*Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1057 [134 Cal.Rptr.2d 358].) We review the court's ruling on a summary adjudication motion independently. (*Ibid.*)

II

*"At-will" Status and Promissory Fraud*

■ "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) The tort of negligent misrepresentation does not require scienter or intent to defraud, but it does, of course, require proof of justifiable reliance and resulting damage. (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962 [226 Cal.Rptr. 532].)

" 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981] (*Lazar*).) "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. [Citations.] In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. 'If it is enforceable, the [plaintiff] . . . has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract.' [Citations.] Recovery, however, may be limited by the rule against double recovery of tort and contract compensatory damages." (*Ibid.*)

The trial court's summary adjudication ruling is based solely on the "at-will" provision in the Compensation Plan. If an employee is "at-will," the employer may "act peremptorily, arbitrarily, or inconsistently [in terminating the employee], without providing specific protections such as prior warning,

fair procedures, objective evaluation, or preferential reassignment." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 350 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).)

" ' "There cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." [Citations.] The express term is controlling even if it is not contained in an integrated employment contract. [Citation.] Thus, the . . . at-will agreement preclude[s] the existence of an implied contract requiring good cause for termination.' " (*Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 38 [105 Cal.Rptr.2d 525]; *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 630 [41 Cal.Rptr.2d 329].) When the employment contract contains an "at-will" provision, an employee's "reliance on . . . oral promises of continuing employment is simply not justifiable . . . ." (*Slivinsky v. Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 807 [270 Cal.Rptr. 585].) In *Guz,* the court observed that most California cases "have held that an at-will provision in an *express written agreement,* signed by the employee, *cannot* be overcome by proof of an implied contrary understanding." (*Guz, supra,* 24 Cal.4th at p. 340, fn. 10.) This court has followed that rule. (*Tollefson v. Roman Catholic Bishop* (1990) 219 Cal.App.3d 843, 855–856 [268 Cal.Rptr. 550], disapproved on another ground in *Scott v. Pacific Gas and Electric Company* (1995) 11 Cal.4th 454, 474, fn. 5 [46 Cal.Rptr.2d 427, 904 P.2d 834], disapproved on another ground in *Guz, supra,* at p. 352, fn. 17.)

■ Agosta contends the "at-will" provision here is ineffective because it does not include the warning Astor could fire him without good cause. By definition, however, an express at-will contract allows an employer to sever the employment relationship with or without cause. (See, e.g., *Bionghi v. Metropolitan Water Dist.* (1999) 70 Cal.App.4th 1358, 1364 [83 Cal.Rptr.2d 388]; *Malmstrom v. Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 315 [231 Cal.Rptr. 820].) Agosta relies on *Seubert v. McKesson Corp.* (1990) 223 Cal.App.3d 1514 [273 Cal.Rptr. 296], but that case concerned an employment application that stated employment could be terminated at any time, not an express at-will provision in an employment agreement. The court held the application did not preclude the introduction of parol evidence to show an implied contract requiring cause for termination. (*Id.* at p. 1520.) Also without merit is Agosta's assertion the "at-will" provision is inapplicable because the Compensation Plan "fails to indicate that it is a contract or that it does anything other than set forth compensation guidelines." ■ To be enforceable a written agreement need not be entitled "contract." "A contract is an agreement to do or not to do a certain thing" (Civ. Code, § 1549), and the elements of a contract include parties capable of contracting, their mutual consent, a lawful object and sufficient

consideration (*id.*, §§ 1550, 1565). Further, the Compensation Plan addresses the length of employment by including the at-will provision.

We are also unpersuaded by Agosta's assertion the Compensation Plan is ambiguous because it "does not indicate whether . . . [he] would be considered an 'at-will' employee." The contract states "Company is an 'at will' employer," and thus its employees are necessarily employed at-will. Further, the contract states "either party may terminate employment upon notice to the other party." Additionally, Agosta's assertion the at-will provision was "hidden in the boiler plate" [*sic*] is untrue. The Compensation Plan is written and does not consist of standardized text, it is only two and one-half pages long and the at-will provision appears directly above the signature line in the same readable type as other provisions.

We agree with the trial court that parol evidence is inadmissible to vary the "at-will" term of the parties' agreement. Nonetheless, Astor is not entitled to judgment as a matter of law on Agosta's misrepresentation causes of action. "A motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).)

In *Lazar, supra,* 12 Cal.4th 631, a demurrer case, the court held the plaintiff's complaint stated a cause of action for fraudulent inducement of an employment contract. The complaint alleged that in reliance on the defendant's promise of long-term employment *and assurances of the company's viability and future pay raises,* he quit his job in New York and moved his family to Los Angeles to accept a general manager position. It also alleged the defendant refused the plaintiff's request for a written employment contract, saying " 'our word is our bond,' " and after the plaintiff performed for two years in an exemplary manner the defendant fired him because of a management reorganization. (*Id.* at p. 636.)

The court explained: "[I]t is a truism that contract remedies alone do not address the full range of policy objectives underlying the action for fraudulent inducement of contract. In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future. [Citation.] Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for 'predictability about the cost of contractual relationships' [citation], fraud plaintiffs may recover 'out-of-pocket' damages in addition to benefit-of-the bargain damages. [Citations.] For example, a fraudulently hired employee . . . may incur a variety of damages *'separate from the termination' itself,* such as the expense and disruption of moving or *loss of security and income associated with former employment.*" (*Lazar, supra,* 12 Cal.4th at p. 646, italics added.)

In *Lazar,* the court held that under his fraud cause of action the plaintiff "may properly seek damages for the costs of uprooting his family, expenses incurred in relocation, and the loss of security and income associated with his former employment in New York." (*Lazar, supra,* 12 Cal.4th at pp. 648–649.) The court also noted the plaintiff "must rely on his *contract* claim for recovery of any loss of income allegedly caused by wrongful termination of his employment." (*Id.* at p. 649.)

Astor asserts *Lazar* is inapplicable because there was no written employment contract in that case. Agosta counters that the employee in *Lazar* was "at-will." Actually, in *Lazar* the employee's complaint alleged an oral agreement of long-term employment. (*Lazar, supra,* 12 Cal.4th at p. 636.) There is a presumption that employment is "at-will" (Lab. Code, § 2922), but the presumption may be rebutted by evidence of an agreement to terminate employment only for cause. (*Starzynski v. Capital Public Radio, Inc., supra,* 88 Cal.App.4th 33, 37–38.) The court in *Lazar* did not address the nature of employment, and the issue is irrelevant to its holding. An "at-will" employee cannot obtain tort recovery for damages arising from termination of employment, because parol evidence is inadmissible to prove a collateral promise. Fraudulent inducement causing damages unrelated to the employee's discharge is an actionable tort regardless of whether he or she is "at-will." Certainly the objectives of punishing intentional misconduct and deterring future fraud are not dependent on the nature of employment.

Astor asserts Agosta cannot prove justifiable reliance, citing evidence Clear Channel would have allowed Astor to rescind his resignation had he changed his mind before the close of his last day at work, April 27. The Compensation Plan, however, did not alert Agosta to Astor's intent to renege on *compensation* terms. Agosta could not justifiably rely on a collateral promise of long-term employment because the "at-will" provision superseded any prior or contemporaneous agreement at variance with that term. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 346 [9 Cal.Rptr.3d 97, 83 P.3d 497].) But he could justifiably rely on the written promises regarding compensation terms. As to those terms, the parol evidence rule is inapplicable.

Astor failed to meet his initial burden of showing entitlement to summary adjudication on the misrepresentation causes of action, and the burden never shifted to Agosta to raise a triable issue of material fact. In any event, Agosta produced evidence from which a jury could reasonably infer Astor promised him the compensation package he sought to lure him into changing employment, Astor never intended to live up to the agreement, and Agosta suffered compensable damages apart from damages caused by his firing. At a minimum it appears that, as was the plaintiff in *Lazar,* Agosta is entitled to compensation for "the loss of security and income associated with

his former employment." (*Lazar, supra,* 12 Cal.4th at p. 649.) Contrary to Astor's unabashed argument at the hearing on appeal, an "at-will" employer does not have carte blanche to lie to an employee about any matter whatsoever to trick him or her into accepting employment.

## III

### *Implied Covenant of Good Faith and Fair Dealing*

Additionally, Agosta contends the trial court erred by summarily disposing of his cause of action for breach of the implied covenant of good faith and fair dealing. We conclude summary adjudication is proper on this cause of action.

"It is well established that ' "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything [that] will injure the right of the other to receive the benefits of the agreement." ' " (*Camp v. Jeffer, Mangels, Butler & Marmaro, supra,* 35 Cal.App.4th at p. 631.) The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Guz, supra,* 24 Cal.4th at pp. 349–350.) "Thus if the employer's termination decisions, however arbitrary, do not breach . . . a substantive contract provision, they are not precluded by the covenant." (*Id.* at p. 350.)

In *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], the court emphasized that "breach of the implied covenant cannot logically be based on a claim that [the] discharge [of an at-will employee] was made without good cause." (*Id.* at p. 698, fn. 39.) The court explained that "[i]f such an interpretation applied, then all at-will contracts would be transmuted into contracts requiring good cause for termination, and Labor Code section 2922 would be eviscerated . . . . Because the implied covenant protects only the parties' right to receive the benefit of their agreement, and, in an at-will relationship there is no agreement to terminate only for good cause, the implied covenant standing alone cannot be read to impose such a duty." (*Ibid.*)

In *Guz,* the court held the "same reasoning applies to any case where an employee argues that even if his employment was at will, his arbitrary dismissal frustrated his contract benefits and thus violated the implied covenant of good faith and fair dealing. Precisely because employment at will *allows* the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so. In such a case, 'the employee cannot complain about a deprivation

of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance.' " (*Guz, supra,* 24 Cal.4th at p. 350.)

■ The court acknowledged in *Guz* that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation *already earned*." (*Guz, supra,* 24 Cal.4th at p. 353, fn. 18, italics added.) Agosta, however, does not claim entitlement to any earned benefits under the Compensation Plan. Rather, he seeks losses associated with the termination of his contract benefits, such as the "continuing future employment and receipt of continued higher compensation," claims that *Guz* precludes.

## DISPOSITION

We reverse the judgment and direct the trial court to enter an order granting Astor's summary adjudication motion only as to the cause of action for breach of the implied covenant of good faith and fair dealing (fourth cause of action) and denying it as to the causes of action based on misrepresentation (first, second and third causes of action). We award Agosta costs on appeal.

Huffman, J., and McIntyre, J., concurred.

A petition for a rehearing was denied August 2, 2004, and respondents' petition for review by the Supreme Court was denied October 27, 2004.